# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Robert E. Blackburn

Civil Case No. 22-cv-01909-REB-NRN

ADAM JOHNSON,

    Plaintiff,

v.

GREENFIELD HOLDINGS, LLC, a Delaware limited liability company, and
GREENFIELD EMPLOYEES, LLC, a Delaware limited liability company,

    Defendants.

## ORDER DENYING MOTION TO DISMISS

**Blackburn, J.**

The matter before me is **Defendants' Motion To Dismiss First Amended Complaint** [#37],[1] filed December 23, 2022. I deny the motion.

### I. JURISDICTION

I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332 (diversity of citizenship).

### II. STANDARD OF REVIEW

When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), I must determine whether the allegations of the complaint are sufficient to state a claim within the meaning of Fed. R. Civ. P. 8(a). For many years, "courts followed the axiom that dismissal is only appropriate where 'it appears beyond doubt that the plaintiff can prove

---

[1] "[#37]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

no set of facts in support of his claim which would entitle him to relief.'" ***Kansas Penn Gaming, LLC v. Collins***, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting ***Conley v. Gibson***, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). Concluding that standard "has been questioned, criticized, and explained away long enough," the Supreme Court supplanted it in ***Bell Atlantic Corp. v. Twombly***, 550 U.S. 544, 562, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007).

Now under ***Twombly*** , the court reviews the complaint to determine whether it "'contains enough facts to state a claim to relief that is plausible on its face.'" ***Ridge at Red Hawk, L.L.C. v. Schneider***, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting ***Twombly***, 127 S.Ct. at 1974). "This pleading requirement serves two purposes: to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense, and to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim." ***Kansas Penn Gaming***, 656 F.3d at 1215 (citation and internal quotation marks omitted).

As previously, I must accept all well-pleaded factual allegations of the complaint as true. ***McDonald v. Kinder-Morgan, Inc.***, 287 F.3d 992, 997 (10th Cir. 2002). Contrastingly, mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not be sufficient to defeat a motion to dismiss. ***Ashcroft v. Iqbal***, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citations and internal quotation marks omitted). ***See also Robbins v. Oklahoma***, 519 F.3d 1242, 1247-48 (10th Cir. 2008) ("Without some factual allegation in the complaint, it is hard to see how

2

a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.") (quoting **Twombly**, 127 S.Ct. at 1974) (internal citations and footnote omitted).

Nevertheless, to meet the plausibility standard, the complaint must suggest "more than a sheer possibility that a defendant has acted unlawfully." **Iqbal**, 129 S.Ct. at 1949. **See also Ridge at Red Hawk**, 493 F.3d at 1177 ("[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.") (emphases in original). For this reason, the complaint must allege facts sufficient to "raise a right to relief above the speculative level." **Kansas Penn Gaming**, 656 F.3d at 1214 (quoting **Twombly**, 127 S.Ct. at 1965). The standard is not met by allegations which are "so general that they encompass a wide swath of conduct, much of it innocent." **Robbins**, 519 F.3d at 1248. Instead "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." ***Id.***

The nature and specificity of the allegations required to state a plausible claim will vary based on context and will "require[] the reviewing court to draw on its judicial experience and common sense." **Iqbal**, 129 S.Ct. at 1950; **see also Kansas Penn Gaming**, 656 F.3d at 1215. Nevertheless, the standard remains a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." **Dias v. City**

3

*and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 127 S.Ct. at 1965) (internal quotation marks omitted).

## III.  ANALYSIS

This is a suit for payment of a bonus which allegedly was earned, vested, and determinable.  Plaintiff, Adam Johnson, was hired as CEO of defendant Greenfield[2] in July 2019.  (**First Amended Complaint** [hereinafter "**FAC**"] ¶14 at 3.)  In that capacity, he reported to Christopher James and the Board of Directors.  (**FAC** ¶ 17 at 3.)

In 2020, Mr. Johnson allegedly developed a business plan proposing the company trade agricultural commodities in cash and futures markets.  He pitched his idea to Mr. James, who approved the plan (the "Trading Function").  Mr. Johnson alleges he was paid nothing extra to develop the Trading Function.  (**FAC** ¶¶ 18-22 at 4.)  Mr. Johnson and Mr. James allegedly verbally agreed that Greenfield would pay a year-end commission (the "Trading Bonus") to employees who performed the Trading Function equal to 20% of the program's net profit margin.  Pursuant to this same alleged verbal agreement, Mr. Johnson was to have full discretion to allocate the Trading Bonus among employees, including himself, who performed the Trading Function.  (**FAC** ¶¶ 23-26 at 4-5.)

In its first year, the program earned the company $1.25 million, and Mr. Johnson allocated the resulting $250,000 Trading Bonus evenly between himself and the one

---

[2] Defendant, Greenfield Holdings, LLC, is "an integrated agricultural infrastructure company;" defendant Greenfield Employees, LLC, is the employing entity for the company.  (**FAC** ¶¶ 12 & 13 at 3.)  It is alleged further that the Greenfield defendants consist of two members:  Medlock Investments, LLC, and The James Family Irrevocable Trust.  (**FAC** ¶ 4 at 2.)  Defendants are referred to collectively in the First Amended Complaint as "Greenfield" in the singular, and for ease of reference, the court will do the same herein.

4

other employee who performed the Trading Function that year.  The program was even more successful the following year, bringing in more than $17.3 million for the company.  Mr. Johnson alleges the same verbal agreement as to the amount and allocation of the Trading Bonus carried into 2021, such that the Trading Bonus was $3.4 million.  (**FAC ¶¶** 27-35 at 5-6.)

In late 2021, Greenfield allegedly consulted a tax professional concerning how to minimize its tax liability for the year.  On December 30, 2021, Mr. James was advised by Greenfield's chief financial officer, Kyle Egbert, that to take advantage of certain tax benefits, Mr. James had to both approve the 2021 Trading Bonus (as well as other employee bonuses for that year) and designate payment as non-discretionary before the end of the year, i.e., the following day.  In response, Mr. James executed an agreement (the "Written Consent") by which the company, *inter alia*, "approved and confirmed in all respects" employee bonuses for the year, authorized Mr. Johnson and Mr. Egbert "to coordinate the calculation, communication and payment" of employee bonuses, and designated the Trading Bonus for the year as 20% of net profits.  (**FAC ¶¶** 35-37 at 6-7; **FAC App.** Exhs. 1 at 1 & 1.A. ¶ 1.)

Based on that agreement, Mr. Johnson allocated $3.4 million to the Trading Bonus pool for 2021 and designated $1.6 million as his share.  Mr. Johnson alleges his allocations were approved by Mr. James, Mr. Egbert, and Cory Leonard, a member of the board, and that payment was scheduled to occur before March 15, 2022.  Thereafter, however, for reasons that are not made manifest in the First Amended Complaint, Mr. James asked Mr. Johnson to defer 40% of his portion of the Trading

5

Bonus. Mr. Johnson was paid the other 60% of his Trading Bonus for 2021, and the parties began negotiating terms for the payment of the remainder. (**FAC ¶¶** 39-44 at 7-8.)

Ultimately, however, the parties were unable to agree on terms for a deferred payment. Mr. Johnson alleges this state of affairs arose because Greenfield sought to impose additional, *post hoc* conditions on its obligation to pay, including, specifically, that the entire deferred portion would be forfeited if Mr. Johnson's employment was terminated within the next two years. When Mr. Johnson refused, Greenfield demanded he sign a new agreement that would divest him of entitlement to any Trading Bonus in 2022 if he resigned or was fired. Unwilling to agree to these terms, Mr. Johnson resigned his employment on May 4, 2022. (**FAC ¶¶** 45-50 at 8-9.) This lawsuit followed.

Herein, Mr. Johnson brings a single claim for violation of the Colorado Wage Claim Act ("CWCA"), §§8-4-101 — 8-4-125, C.R.S., alleging the unpaid portion of his 2021 Trading Bonus constitutes wages which were earned, vested, and determinable at the time of his resignation. Greenfield seeks to dismiss that claim for failure to state a plausible claim for relief. It maintains Mr. Johnson cannot base his claim on the Written Consent because the parties were still negotiating, and ultimately failed to agree on, essential terms for the payment of the deferred portion of Mr. Johnson's 2021 Trading Bonus. Nor, according to Greenfield, can Mr. Johnson rely on the parties' prior alleged verbal agreement regarding payment because that agreement violates the Statute of Frauds. Neither of these arguments has merit.

The CWCA was enacted to ensure that "employers make timely payment of wages and to provide adequate judicial relief when employers fail to pay wages when due." *Cagle v. Mathers Family Trust*, 295 P.3d 460, 469 (Colo. 2013) (citation, internal quotation marks, and ellipses omitted). *See also Brownlee v. Lithia Motors, Inc.*, 49 F.Supp.3d 875, 878 (D. Colo. 2014). When, as here, an employee resigns, any wages then due are payable on the next regular payday. §8-4-109(1)(b), C.R.S. "Wages" include, relevantly for present purposes, bonuses. §8-4-101(14)(a)(II), C.R.S.

Nevertheless, the CWCA does not create any substantive rights. "'Rather, it establishes minimal requirements concerning when and how *agreed* compensation must be paid.'" *Kouzmanoff v. Unum Life Insurance Co. of America*, 374 F.Supp.3d 1076, 1088 (D. Colo. 2019) (quoting *Barnes v. Van Schaack Mortgage*, 787 P.2d 207, 210 (Colo. App. 1990)) (emphasis in original). More specifically, a bonus is payable only when it is shown to have been "earned for labor or services performed in accordance with the terms of any agreement between an employer and employee." § 8-4-101(14)(a)(II), C.R.S. Thus, wages are due when they are "earned, vested, and determinable" pursuant to the terms of any such agreement. §8-4-109(3)(b), C.R.S.[3] *See also Kouzmanoff*, 374 F.Supp.3d at 1088 ("That language signals the General Assembly's aversion to employees relying on indefinite, possible remittances."). Accordingly, to show his bonus was "earned, vested, and determinable," Mr. Johnson plausibly must allege he has "an enforceable right to receive payment for such benefits

---

[3] It has been noted that despite the legislature's attempt to clarify the requirements of the CWCA by amendments in 2003, the statute continues to suffer from "poor draftsmanship." *Hernandez v. Ray Domenico Farms, Inc.*, 250 F.Supp.3d 789, 800 & n.9 (D. Colo. 2017), *certified question answered*, 414 P.3d 700 (Colo. 2018).

pursuant to an employment agreement." ***Echon v. Sackett***, 2019 WL 8275344 at *6 n.6 (D. Colo. Feb. 12, 2019), ***aff'd***, 809 Fed. Appx. 468 (10th Cir. 2020) (citation and internal quotation marks omitted).

Acknowledging the terms "earned," "vested," and "determinable" frequently have been defined, unhelpfully, by reference to one another, ***Kouzmanoff***, 374 F.Supp.3d at 1088, courts have turned to the dictionary. Thus, wages are "earned" when they are "receive[d] as return for effort and especially for work done or services rendered." Merriam-Webster, Dictionary, *Earned* (available at: https://www.merriam-webster.com/dictionary/earn) (last accessed: May 10, 2023).) A right to compensation is "vested" where it is "not contingent" but instead "unconditional" or "absolute," ***Kouzmanoff***, 374 F.Supp.3d at 1089 (citation and internal quotation marks omitted); it is determinable when it is "capable of being determined, definitely ascertained, or decided upon," Merriam-Webster, Dictionary, *Determinable* (available at: https://www.merriam-webster.com/dictionary/determinable) (last accessed: May 10, 2023).) Mr. Johnson plausibly alleges that the Written Consent satisfies all three of these preconditions.

There can be no reasonable dispute that the First Amended Complaint adequately alleges Mr. Johnson's 2021 bonus was "earned," and I do not read Greenfield to suggest otherwise. None of the terms which Greenfield claims were undecided at the time Mr. Johnson separated from employment is related to whether he actually performed the work which the Trading Bonus was intended to compensate. ***See Cahey v. International Business Machines Corp.***, 2021 WL 5384526 at *7 (D. Colo. Nov. 18, 2021). The First Amended Complaint alleges the Trading Function resulted in

$17.3 million in profits in 2021 (**FAC** ¶ 33 at 6), and the Written Consent designated 20% of that amount for the payment of the Trading Bonus to eligible employees (**FAC App.**, Exh. 1.A. ¶ 1 at 1).  As the person who had created and oversaw the Trading Function 2021  (**FAC** ¶ 32 at 6), and previously had received bonuses for similar work in 2020 (**FAC** ¶¶ 27-30 at 5), Mr. Johnson ostensibly was entitled to a Trading Bonus of some amount, and indeed, Greenfield paid him 60% of his alleged share (**FAC** ¶ 43 at 8).  Accordingly, Mr. Johnson has alleges this element of his CWCA claim.

It is also clear Mr. Johnson plausibly alleges his right to receive the Trading Bonus was vested.  The First Amended Complaint alleges the Written Consent was drafted after Greenfield was advised that, to minimize its tax liability for the year, bonuses needed to be both approved and designated as non-discretionary before January 1, 2022.  (**FAC** ¶ 36 at 6.)  To that end, the Written Consent explicitly provided "the Employee Bonuses as described in Exhibit A are *approved* and *confirmed* in all respects."  (**FAC App.**, Exh. 1 ¶ 1 at 1 (emphases added).)  By this designation, Mr. Johnson's right to a Trading Bonus was "unconditional [and] absolute." ***Kouzmanoff***, 374 F.Supp.3d at 1089.

Finally, Mr. Johnson plausibly alleges his Trading  Bonus was determinable.  Mr. Johnson allegedly made the allocations of the 2021 Trading Bonuses, including his own, and Greenfield allegedly approved them; in fact, Mr. Johnson alleges every other employee who was entitled to a Trading Bonus in that year received 100% of the bonus they were allocated.  (**FAC** ¶ 49 at 9.)   Thus, based on the allegations of the First Amended Complaint, Mr. Johnson's 2021 Trading Bonus was not just determinable; it

9

already had been determined.

Greenfield nevertheless maintains the First Amended Complaint fails to allege a plausible CWCA claim because the parties had not agreed on all material terms for payment of Mr. Johnson's 2021 Trading Bonus.  More specifically, Greenfield suggests the Written Consent does not create an enforceable right because it only sets aside a total pool of money but does not provide a formula for determining how much any particular recipient should be paid or when payment is due.  I assume, without deciding, that an agreement sufficient to create an enforceable right under the CWCA must meet all the requirements for the existence of a valid, enforceable contract.  Nevertheless, even on its own terms, Greenfield's argument fails.

It is hornbook law that, to form a valid contract, parties must agree on all essential terms which are "sufficiently definite to enable the court to determine whether the contract has been performed or not."  **Bill Barrett Corp. v. YMC Royalty Co., LP**, 918 F.3d 760, 766 (10th Cir. 2019) (citation and internal quotation marks omitted).  While "there can be no binding contract if it appears that further negotiations are required to work out important and essential terms," **DiFrancesco v. Particle Interconnect Corp.**, 39 P.3d 1243, 1248 (Colo. App. 2001), the determination of the material terms of any particular contract is made with reference to "the intention of the parties as disclosed upon consideration of all surrounding facts and circumstances there prevailing," **Gates Corp. v. Bando Chemical Industries, Ltd.**, 4 Fed. Appx. 676, 684 (10th Cir. 2001) (quoting **American Mining Co. v. Himrod–Kimball Mines Co.**, 235 P.2d 804, 807 (Colo. 1951) (en banc)) (internal quotation marks omitted).  Here, the court perceives

nothing to suggest the conditions to which Greenfield points – the lack of a particular formula for determining individual bonuses and the timing of payment – are essential terms of the contract evidenced by the Written Consent.

That the agreement only calculated the total amount of the 2021 Trading Bonus and did not provide an allocation formula cannot be material in this case because the document also expressly "authorized, empowered and directed" Mr. Johnson, "acting alone" as an "Authorized Signatory" "for and in the name of and on behalf of the Company," "to coordinate the calculation, communication and payment of the Employee Bonuses to individual employees." (**FAC App.**, Exh. 1 ¶¶ B & 3 at 1.)  Thus, the Written Consent granted Mr. Johnson complete, unfettered discretion to calculate the amount of each individual Trading Bonus, including his own, just as he allegedly had under the parties' prior verbal understandings.  It did not even reserve to Greenfield a right to approve Mr. Johnson's calculations, although he nevertheless also alleges he submitted his allocations for approval and received same.  (**FAC ¶** 40 at 7.)[4]

Nor is the timing of payment vis-à-vis separation from employment an essential term of the contract.  The CWCA itself supplies the answer to the question when wages which are earned, vested, and determinable are due.  **See** § 8-4-109(1)(b), C.R.S. ("When an employee quits or resigns such employee's employment, the wages or compensation shall become due and payable upon the next regular payday."). Moreover, it is reasonable to infer, from the allegation that all other employees were paid the full amount of their Trading Bonuses, that no other employee was asked to

---

[4]  These facts distinguish this case from **Long v. OmniTRAX, Inc.**, on which Greenfield places so much reliance.  The relevant agreement there reserved to the company the sole discretion to alter the bonus program.  2014 Colo. Dist. LEXIS 3576 at *5, *9-10 (Colo. Dist. Ct., Denver Cty., March 17, 2014).

defer payment or agree to additional conditions. The clear implication is that no such conditions remained unresolved. Finally, given the Colorado Supreme Court's recent decision in ***Nieto v. Clark's Market, Inc.***, the court doubts Greenfield could have demanded Mr. Johnson agree to forfeit his right to an earned bonus if he were terminated. 488 P.3d 1140, 1146-49 (Colo. 2021) (CWCA prohibits forfeiture of earned vacation pay; any contract term that purports to forfeit earned vacation pay is void). ***See also*** § 8-4-121, C.R.S. (agreements waiving or modifying employee's rights in violation of the CWCA are void); ***Hallmon v. Advance Auto Parts, Inc.***, 921 F.Supp.2d 1110, 1120 (D. Colo. 2013) (interpreting agreement to allow forfeiture of earned bonus on termination "would allow employers to manipulate similar contractual language to avoid paying rightful wages to employees by conveniently terminating them shortly before their payday, contravening the public policy behind the CWCA").

Because Mr. Johnson has plausibly alleged his 2021 Trading Bonus was earned, vested, and determinable, his willingness to participate in further negotiations with Greenfield reasonably can be construed as simply gratuitous on his part. There is nothing in the Written Consent that suggests it does not represent the parties' full and complete agreement. The reasonable inference is that the negotiations pertained to, and the parties ultimately failed to agree on, modifications to the parties' earlier agreement. ***See United States for Use of Mobile Premix Concrete, Inc. v. Santa Fe Engineers, Inc.***, 515 F.Supp. 512, 515 (D. Colo. 1981) ("A meeting of the minds of the contracting parties is required not only to make a contract, but also to modify it."). Such failure does not undermine Mr. Johnson's allegations of his entitlement to the bonus

which the Written Consent contemplates.[5]

## IV.  ORDERS

**THEREFORE, IT IS ORDERED** that **Defendants' Motion To Dismiss First Amended Complaint** [#37], filed December 23, 2022, is denied.

Dated May 12, 2023, at Denver, Colorado.

BY THE COURT:

*Bob Blackburn*
Robert E. Blackburn
United States District Judge

---

[5] Because Mr. Johnson plausibly alleges an enforceable written contract, Greenfield's argument premised on the Statute of Frauds is a non-starter.  *See* §38-10-112(1)(a), C.R.S.

13